**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| **ABBOTT LABORATORIES,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.** |
| | ) | |
| **JEROME CLAVEL,** | ) | **COMPLAINT** |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

Plaintiff Abbott Laboratories, for its Complaint against Defendant Jerome Clavel, alleges as follows:

## INTRODUCTION

1. Abbott's employee, Jerome Clavel, is about to take its valuable plans and trade secrets to its direct competitor, Bio-Rad Laboratories, Inc. ("Bio-Rad").

2. Clavel is a Vice President of Global Marketing in Abbott's Diagnostics business, primarily responsible for marketing Abbott's rapid diagnostics tests for infectious diseases—e.g., COVID-19 and HIV—in emerging markets. In that role Clavel also helps develop global marketing plans across Abbott's Diagnostics businesses (Core Lab, Molecular, and Rapid), and is involved in developing Abbott's long-term planning and strategies. All of these projects gave Clavel access to Abbott's confidential and trade secret information about its current and future business plans in Diagnostics.

3. Clavel resigned from Abbott on October 15, 2020, telling his boss and a Human Resources representative that he was doing so for his health and well-being, and that he had not "signed on with any job at this point." That was a lie. In reality, Clavel signed an offer letter

accepting a position as the Vice President of Marketing in Bio-Rad's Clinical Diagnostics division on October 15, the very same day he resigned.

4.     Bio-Rad competes with Abbott for market share in many of the key areas that Clavel worked on at Abbott. For example, Bio-Rad has products for COVID-19 and HIV, and it sells analyzers, tests, calibrators, and controls, all of which directly compete with Abbott's Diagnostics businesses. Indeed, Bio-Rad listed Abbott second on its list of "major competitors" in its 2019 Annual Report.

5.     Clavel knew that going to Bio-Rad's Clinical Diagnostics division would be a breach of his Employment Agreement with Abbott, which prohibits him from working in a similar function for a competing business for twelve months after leaving his employment. Nevertheless, he repeatedly told HR that he would "of course be mindful of [his] employee agreement, and observe [his] obligations." That too was a lie.

6.     On October 20, 2020, Abbott learned independently that Bio-Rad had internally announced Clavel as its new Marketing VP in Clinical Diagnostics. When Abbott confronted Clavel with this news, he lied again, maintaining that he had not yet signed any offer of employment.

7.     Even though Clavel continued to deny that he had accepted an offer at Bio-Rad, Abbott asked Clavel to return his Abbott property on October 20, after learning he had been announced at Bio-Rad. Clavel returned his Abbott-owned laptop and iPhone later that day, but he refused for more than a week to provide his passwords, in breach of his Employment Agreement.

8.     Clavel's lies and refusal to provide passwords in turn prompted a forensic review of his laptop, which revealed that on the very same morning that he was asked to return his laptop, Clavel connected at least *five separate* removable USB devices to the computer.

9.     Although it is impossible to determine exactly what Clavel may have copied to these external storage devices, the information available indicates that Clavel's devices contain Abbott confidential documents and information. Indeed, on one large external drive Clavel used, he has a folder named "Backup Oct 2020," which contains Abbott documents.

10.     During his exit interview on October 28, 2020, Abbott asked Clavel directly whether he had any Abbott information stored on any disks, thumb drives, or other external devices. Clavel denied that he used any such devices to store Abbott documents. Yet another lie.

11.     Moreover, Abbott's review of Clavel's work email revealed a similar pattern of behavior. For months Clavel has been forwarding Abbott communications to his personal Gmail account, including highly confidential forecasts related to Abbott's proprietary COVID-19 antigen tests, in direct contravention of company policy.

12.     The conclusion is inescapable—Clavel is leaving to join a competitor as a top marketing executive, and he's planning to take Abbott's confidential information and trade secrets with him. Clavel's behavior violates his Employment Agreement with Abbott, the Illinois Trade Secrets Act, and the federal Defend Trade Secrets Act. Clavel must be immediately and permanently enjoined from continuing this course of conduct, or Abbott's Diagnostics Division will be seriously, and irreparably, harmed.

## THE PARTIES

13.     Abbott is an Illinois corporation with its principal place of business in Abbott Park, Illinois.

14.     Defendant Jerome Clavel is an individual who was employed by Abbott and, upon information and belief, is a resident of Lincolnshire, Illinois, and a citizen of Illinois.

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction over this dispute pursuant to 28 U.S.C. § 1331 over claims asserted under the Defend Trade Secrets Act (DTSA). The Court has supplemental jurisdiction over the remaining state-law claims for misappropriation of trade secrets and breach of contract under 28 U.S.C. § 1367 because those claims are so closely related to Abbott's federal claims under the DTSA that they form part of the same case or controversy.

16.     Venue is appropriate in this District pursuant to 28 U.S.C. § 1391 and because the parties' contract requires venue and jurisdiction to be in court in the State of Illinois. Ex. A, Employment Agreement § 16(a) ("Jurisdiction / Venue ... The parties agree to the exclusive jurisdiction of the state and federal courts in Illinois, in any action or proceeding arising out of or relating to this Agreement or the transactions contemplated hereby…"). Clavel is a resident of Lincolnshire, in the Northern District.

## FACTUAL ALLEGATIONS

## I.     Abbott Hired Clavel as a Global Marketing Vice President.

17.     Abbott is a global healthcare company that develops, markets, and sells, among other things, diagnostic products to improve the health and lives of individuals around the world.

18.     Abbott hired Clavel on April 25, 2019 as Vice President, Global Marketing, Infectious Disease Emerging Markets (IDEM), Abbott Rapid Diagnostics. Clavel reported to Damian Halloran, Vice President of IDEM.

19.     In this role, Clavel identified product solutions and market opportunities for Abbott's key business franchises for IDEM. Clavel was responsible for overseeing long-range strategic planning and initiatives for various marketing and business strategy projects across the globe in over 160 countries. For instance, Clavel worked on global marketing strategies for

Abbott's rapid HIV diagnostic platforms, and more recently, Panbio COVID-19 Ag, which is Abbott's newly developed rapid COVID-19 test.

20.     As a high-level marketing employee in Diagnostics, Clavel also collaborated on a number of cross-divisional business initiatives—known as "One Abbott." Accordingly, he is intimately familiar with market entry strategy, demand planning, pricing strategies, and future business plans related to Abbott's COVID-19 and HIV product lines across Abbott's Diagnostics businesses.

21.     Given Clavel's access to confidential information, Abbott negotiated a number of provisions in Clavel's Employment Agreement to protect the company from potential unlawful disclosure of any trade secrets or sensitive business information that, if disclosed, might harm Abbott or help a competitor in U.S. and global diagnostics markets. Abbott negotiated these protections, among others, in exchange for adequate consideration.

22.     Clavel's Employment Agreement contains a number of provisions outlining Clavel's obligations, including handing over his passwords to Abbott equipment, and protecting the disclosure of Abbott's confidential information:

> 6. **Return of ABBOTT property.** Prior to terminating employment from ABBOTT (or otherwise upon request by ABBOTT), EMPLOYEE shall return all ABBOTT property, and shall not retain any copies, reproductions, abstracts or summaries of the property. ABBOTT property includes, but is not limited to, all identification badges, passwords, access cards or codes, keys, automobiles, computers, telephones or other equipment, memoranda, notes, records, reports, files or other documents, photographs, drawings, plans, papers, computer software, compounds, customer and client lists, products/inventory and materials, as well as ABBOTT intellectual property made or compiled by or made available to EMPLOYEE during the course of employment with ABBOTT, and any copies, summaries or abstracts thereof, whether in electronic, paper or other form and whether or not they contain Confidential Information, as well as any telephone numbers maintained by ABBOTT.

8. **Non-Disclosure of Confidential Information.** EMPLOYEE acknowledges and agrees that EMPLOYEE has no right, title or ownership in Confidential Information unless otherwise expressly granted in writing by ABBOTT's Chief Patent Counsel or his/her designee. EMPLOYEE shall use all best efforts to protect the secrecy and confidentiality of all Confidential Information, including, as applicable, such efforts and measures as set forth in ABBOTT policies, procedures and guidelines. EMPLOYEE shall not, during the term of employment with ABBOTT or thereafter, use or disclose, or assist in the disclosure to or use by others, directly or indirectly, any Confidential Information, except as required and authorized in the scope of EMPLOYEE's job responsibilities and in the furtherance of ABBOTT's business (to the extent consistent with applicable confidentiality obligations between ABBOTT and third parties). EMPLOYEE acknowledges and agrees that prior written authorization by ABBOTT is required in accordance with ABBOTT policy before Confidential Information is submitted by EMPLOYEE for possible publication or dissemination. EMPLOYEE acknowledges and agrees that the relationship of EMPLOYEE to ABBOTT with respect to Confidential Information shall be fiduciary in nature.

*See* Ex. A, §§ 6, 8.

23. The Agreement also contains provisions barring Clavel from employment with an Abbott competitor in a similar role for the 12 months following his employment with Abbott:

9. **Non-Competition.** EMPLOYEE shall not, during EMPLOYEE's employment and twelve (12) months after EMPLOYEE's termination for any reason, in each country in which ABBOTT conducts business, except as expressly authorized in writing in advance by the ABBOTT Divisional Vice President & Associate General Counsel, Litigation or his/her designee:

(a) participate in, manage, supervise, or provide services to a Competing Business: (i) that are the same as or similar in function or purpose to any services EMPLOYEE provided to ABBOTT during the last two years of EMPLOYEE's employment with ABBOTT; or (ii) that are otherwise likely to result in the use or disclosure of Confidential Information, notwithstanding EMPLOYEE's undertaking to the contrary;

…

(c) participate in developing or attempting to develop a Competing Product;

6

> (d) directly or indirectly, promote or market any Competing Products to any ABBOTT Customer, or solicit any ABBOTT Customer or Covered Supplier for any purpose related to Competing Product.

*Id.* § 9.

24.     Finally, by signing the Agreement, Clavel acknowledged that Abbott will face irreparable injury in the event of breach or threatened breach of the Agreement, and that he will be responsible for any damages, attorneys' fees, and all other costs and expenses reasonably incurred by Abbott to enforce the Agreement:

> 11. **Breach and Remedies.** In the event of EMPLOYEE's breach or threatened breach of any portion of this Agreement, EMPLOYEE acknowledges and agrees that: …
>
> (d) ABBOTT will face irreparable injury which may not be reasonably possible to calculate in dollar terms, and that in addition to other remedies available, ABBOTT shall be entitled to injunctions enjoining such breach or threatened breach by EMPLOYEE, EMPLOYEE's agents or representatives, or any other persons or entities acting for or with EMPLOYEE. EMPLOYEE further acknowledges and agrees that in addition to any other rights and remedies, ABBOTT shall be entitled to damages, attorneys' fees and all other costs and expenses reasonably incurred by ABBOTT in enforcing this Agreement.

*Id.* § 11.

## II.     Clavel's Global Marketing Role Exposed Him to Confidential Abbott Trade Secrets Regarding COVID-19, HIV Strategy, and Long-Term Strategic Planning.

25.     Abbott's Rapid Diagnostics business offers a variety of products across five core business units: toxicology, cardiometabolic and informatics, infectious diseases in emerging markets, infectious diseases in developed markets, and consumer services and products.

26.     In recent months, Abbott has devoted substantial business resources to developing market-leading responses to the COVID-19 pandemic. Meeting the challenges of the global pandemic is now one of the most important business priorities at Abbott.

27.     As a result, since early 2020, Abbott has engaged its Diagnostics businesses—including Core Lab, Molecular, and Rapid—to leverage its cutting-edge technology and tactical expertise to support communities worldwide with the testing resources to combat COVID-19's evolving threat to global health.

28.     This cross-functional approach is the key to Abbott's competitive edge in highly competitive infectious disease markets.

29.     Apart from specific job responsibilities associated with Abbott's COVID-19 and HIV business franchises, Clavel also worked on some of Abbott's most sensitive and forward-looking long-term business plans related to Abbott's Diagnostic testing products. Through his work on these projects, Clavel had access to highly confidential business information concerning innovative technologies, market assessments, product pipelines, and global strategy both within his IDEM business unit and across the other segments of Abbott's Diagnostics businesses.

**A.      One Abbott Cross-Functional Response to COVID-19**

30.     Since the onset of the COVID-19 global pandemic, Abbott's Diagnostics businesses have devoted substantial resources to producing and distributing comprehensive testing solutions around the world. Abbott has launched nine different COVID-19 tests, including molecular, antigen, and serology tests.

31.     To deliver more than just a standalone diagnostic test, Abbott has leveraged its institutional expertise, including innovative diagnostic technology, its dynamic salesforce, and its customer engagement tools, to provide customized solutions to its global customer base. This comprehensive go-to-market approach covering its entire COVID-19 diagnostic testing portfolio is known as One Abbott.

32.     Clavel is a member of the group responsible for that work, and as a result is familiar with all of Abbott's strategic marketing plans related to COVID-19. He knows what Abbott is

developing, when it plans to launch products and where, and the pricing strategies and other differentiating factors that Abbott plans to use to excel in the market. This is true around the world, and across all of Abbott's Diagnostics businesses—Core Lab, Molecular, and Rapid. In short, he knows Abbott's comprehensive COVID-19 playbook, because he helped make it.

**B.      One Abbott Cross-Functional Effort for HIV Diagnostics**

33.     Clavel also engaged in cross-functional strategic development and management of one of Abbott's most important emerging market businesses: HIV Diagnostics.

34.     As an initial matter, Clavel was directly responsible for marketing Abbott's point-of-care products for HIV testing in emerging markets. As a result, he is intimately familiar with Abbott's strategies for maintaining and growing its market share in that area, with direct knowledge of Abbott's confidential research and development pipeline, product launch plans, pricing strategies, and product differentiation strategies.

35.     Moreover, similar to COVID-19, Clavel worked on the HIV One Abbott cross-functional team, with access to confidential information and documents regarding the performance, forecasts, pricing, product launch plans, and other details regarding Abbott's HIV strategy across Abbott's Diagnostics businesses.

**C.      Abbott's Long-Term Planning for Diagnostics**

36.     Finally, as a Vice President of Global Marketing in Abbott's Rapid Diagnostics division, Clavel was part of a small team engaged in developing Abbott's long-term strategic plan for its entire Diagnostics business, including Core Lab, Molecular, and Rapid.

37.     This project involves highly confidential information about Abbott's future competitive positioning and strategies. Because of his role on the project, Clavel is knowledgeable regarding the details of this long-term strategy.

38.     Clavel's knowledge about this long-term strategic plan would certainly be valuable to a competitor like Bio-Rad.

### D.     Abbott Protects All of Its Trade Secrets and Sensitive Business Information from Disclosure.

39.     In the hands of a competitor, Abbott's future product integration plans and global market strategy for individual product franchises would indisputably harm Abbott.

40.     Abbott offers diagnostic products serving patients and healthcare systems with respect to some of the most challenging and rapidly evolving threats to public health in the world and in some of the most competitive markets, including COVID-19 and HIV.

41.     Beyond its individual products, Abbott also engages in innovative and far-reaching planning for the wider Diagnostics market. A competitor with this information in its hands could either move to thwart Abbott's plans or to leap-frog them.

42.     Given all of these factors, Abbott maintains information regarding the above-mentioned projects in highly secure internal company Share Point drives to avoid disclosure to any unauthorized third party. Competitive information and business strategies are not known to the general public or Abbott's competitors, nor are employees permitted to share confidential information without written authorization from Abbott. *See* Ex. A, Employment Agreement, § 8.

43.     Likewise, Abbott invests millions of dollars each year to protect the confidentiality of its trade secrets and other proprietary information, including implementing appropriate security systems for both its physical offices and electronic databases, as well as restricted, password-protected Share Point drives.

44.     Abbott employs robust technology systems designed to protect the integrity of its data, and monitors its systems for signs of infection, intrusion, and dissemination.

45.     Abbott also restricts access to certain folders on its Share Point to persons whose role is critical to developing, analyzing, or implementing business strategy.

46.     Clavel was one of the few individuals afforded access to confidential Abbott storage locations containing the sensitive business information in his area. That is precisely why Abbott required Clavel to agree not to use or disclose such information except as required and authorized within the scope of his employment and stipulate that he would not work for a competitor in a similar position (where such confidential information might be disclosed) for a period of 12 months after leaving employment with Abbott.

## III.     Clavel Accepted Employment at an Abbott Competitor—Then Lied About His New Position.

47.     Just months after joining Abbott, Clavel's manager, Halloran, documented issues with Clavel's work performance. In a December 2019 performance review, Halloran noted that "2019 was a very challenging year on many fronts" and that Clavel needed to "hold his team measurable and accountable for results" and "build a true partnership with all parties."

48.     Upon information and belief, Clavel began to explore employment opportunities outside of Abbott by at least August 2020.

49.     On September 3, 2020, Clavel met with a third-party recruiter at "The Oft Group" regarding the "Bio-Rad VP Marketing" position.

50.     One month later, on October 12, 2020, Clavel met with the same third-party recruiter and received an offer-of-employment letter with Bio-Rad to serve in the "Clinical Diagnostics Group" as "VP CDG Core DX Marketing."

51.     Two days later, on October 14, Clavel met with two current Bio-Rad employees. The next day Clavel signed Bio-Rad's offer letter.

52.     Instead of informing Abbott of his newfound position at a competitor, Clavel sent an email to Halloran and Laura Kroc, an HR Director, purporting to explain his decision to resign: "for the last few months, but especially the last few weeks, whether through workload and stress accumulation, I had grown increasingly concerned about my health and well-being, gradually dealing with more and more sleeplessness and anxiety. I thought it was time to think things through. And I thought now might be a good time to step back, take a deep breath and consider other things."

53.     Clavel also reported "*I haven't signed on with any job at this point*, I have really good confidence. I am considering a few options and I expect to find something in short order." (emphasis added). He did not mention the offer-of-employment letter he signed for Abbott's direct competitor Bio-Rad the very same day.

54.     Clavel then continued to tell lies about his future employment with Bio-Rad. In an October 19 text message to another Abbott employee, for example, Clavel announced he was leaving Abbott, but only reported he "ha[s] a couple options" in "Boston or San Francisco." He failed to mention that he accepted the Bio-Rad position four days earlier.

55.     Then, on October 20, Abbott discovered independently that Bio-Rad had internally announced Clavel as its new head of marketing in its Clinical Diagnostics group.

56.     When confronted by Abbott about his new role at Bio-Rad, Clavel once again told Abbott that he had not signed anything, was still interviewing, and the announcement at Bio-Rad was premature. Clavel also stated that he was aware of Abbott's non-compete and would not do anything that violated the employment agreement. Again, Clavel said nothing about the Bio-Rad offer letter he had signed on October 15.

57.     In response to Clavel's repeated lies to Abbott, HR instructed Clavel to return his Abbott property. That same day, October 20, Abbott also suspended his access to Abbott networks and Share Point drives.

58.     Around 11:30 AM on October 20, Clavel returned his Abbott-owned laptop and cell phone. But despite multiple requests from Abbott HR employees, Clavel **_refused to provide passwords_** to his devices in violation of his Employment Agreement.

59.     After weeks of lies to Abbott, only at his October 28 exit interview did Clavel finally admit he was taking a global marketing position at Bio-Rad. Incredibly, Clavel claimed that he would not be working on *any* Bio-Rad product lines that competed with Abbott. Nothing about his role at Bio-Rad nor in his offer letter from Bio-Rad suggests that is actually the case.

60.     Only after his exit interview on October 28 did Clavel provide the passwords to his Abbott-owned laptop and iPhone.

## IV.     Clavel Never Told Abbott He Connected His Devices to Multiple External USB Storage Devices and Sent Confidential Business Documents to His Personal Email.

61.     Meanwhile, in the months leading up to Clavel's departure, he repeatedly engaged in conduct that violated Abbott's policies and that strongly suggests he planned to, and did, extract sensitive Abbott business documents and proprietary business information from his Abbott-owned devices.

62.     Specifically, Clavel connected his personal computer to external USB devices and forwarded sensitive Abbott information to his personal Gmail account in the days and weeks leading up to his resignation.

63.     For example, on October 20, the day he surrendered his Abbott-owned computer—after lying to Abbott three times about his accepted employment with Bio-Rad—Clavel connected

his computer to *five different USB storage devices*. In other words, Clavel could have taken hundreds of gigabytes worth of confidential data from Abbott on this day alone.

64.     Clavel's use of so many external storage devices has no plausible relationship to any legitimate business or personal purpose.

65.     Nor did Clavel follow Abbott rules against forwarding confidential business communications to his personal email account. In the months leading up to his resignation, Clavel sent dozens of business communications to and from his personal Gmail account.

66.     After investigating this clear violation of Abbott policies, Abbott confirmed that Clavel sent confidential Abbott business information to his personal Gmail account in the weeks leading up to his departure. On October 9, Clavel forwarded an email containing confidential discussions and analysis regarding Abbott's Panbio antigen COVID-19 tests to his personal Gmail account.

67.     Until Abbott can properly determine which internal documents Clavel downloaded or saved to his multiple USB storage devices on October 20, the only reasonable inference is that Clavel took additional, likely voluminous, similar confidential business analyses related to Abbott's products.

68.     Indeed, although he eventually divulged his passwords, Clavel's rejections of Abbott's requests to provide the passwords to his devices and his abrupt departure from Abbott in favor of a competitor only heightens Abbott's well-founded suspicions that he intends to abscond to Bio-Rad with confidential information.

**V.  Clavel's Role at Bio-Rad Is Nearly Identical to His Current Abbott Position, and Violates the Plain Terms of His Employment Agreement.**

69.     Bio-Rad is a manufacturer of products for the life science research and clinical diagnostics markets. Bio-Rad is based in Hercules, California, but like Abbott, has operations worldwide.

70.     Bio-Rad is a direct competitor to Abbott in the clinical diagnostics space, and it offers several diagnostic testing devices and kits for various immunological, genetic, and molecular related diseases, and infections, including HIV and other infectious diseases. For example, Bio-Rad offers an HIV rapid test known as the Genie™ Fast HIV 1/2 that performs similar rapid testing functions to Abbott's own SD Bioline HIV-1/2 3.0 test.

71.     Similarly, Bio-Rad has branched into the COVID-19 diagnostic market. Like many global diagnostic companies, Bio-Rad has developed products concerning COVID-19 testing and research, including a COVID-19 PCR test and a Platelia Total Antibody Assay kit designed for its own proprietary testing platform. The company has created solutions to address (1) diagnosis and confirmation of COVID-19 infections; (2) COVID-19 antibody detection; (3) infection surveillance; and (4) vaccine and therapeutic research and development. All of these products compete directly with Abbott's COVID-19 testing products, which include SARS-CoV-2 IgG (Immunoassay); Alinity (Immunoassay High Throughput Device); Architect (Immunoassay High Throughput Device); Abbott *m*2000 Real*Time* (PCR High Throughput Device); and Alinity M (PCR High Throughput Device) tests, as well as Abbott's rapid COVID-19 tests including BinaxNOW, Panbio, and tests that run on Abbott's I.D. NOW point-of-care device.

72.     Clavel is joining Bio-Rad as the VP of Clinical Diagnostic Group, Core Diagnostic Marketing. In this role, he would report directly to Ms. Dara Wright, who Bio-Rad reportedly hired in January 2020 to manage the "overall strategy and business direction for Bio-Rad's clinical

diagnostic group." Accordingly, similar to Clavel's collaborative role across diagnostic business functions at Abbott, Clavel's new role at Bio-Rad would involve developing and implementing Bio-Rad's marketing strategies for its global diagnostic business in all disease markets, including COVID-19 and HIV. Indeed, it appears he may well be the top marketing executive in Bio-Rad's Clinical Diagnostics business.

73.     Moreover, Clavel would be taking to Bio-Rad intimate knowledge about Abbott's highly confidential long-term planning for its Diagnostics division as a whole.

74.     Clavel's Employment Agreement expressly prohibits him from taking on any employment responsibilities related to any product in any market where Bio-Rad competes with Abbott. The Agreement states Clavel "shall not … participate in, manage, supervise, or provide services to a Competing Business (i) that are the ***same or similar in function or purpose*** to any services [Clavel] provided to Abbott … ***or*** (ii) that are otherwise likely to result in the ***use or disclosure*** of Confidential Information, notwithstanding [Clavel's] undertaking to the contrary." Ex. A, Employment Agreement, § 9.

75.     Clavel's employment with Bio-Rad violates both prohibitions. First, a global marketing VP position at another diagnostics company that offers COVID-19 and HIV diagnostic tests will indisputably involve services to Bio-Rad that are the "same as or similar in function or purpose" to those Clavel provided Abbott. Nothing in the Bio-Rad offer letter to Clavel suggests that Clavel's employment will be cabined to certain business units to ensure otherwise. Moreover, Clavel has been involved in Abbott's innovative plans for the future of diagnostic testing. It is implausible that he could avoid disclosing or relying on *any* details regarding Abbott's long-term planning while developing and implementing long-term strategy at another diagnostics company.

76.     Second, Clavel's own behavior in departing Abbott suggests that his new position will result in the "use or disclosure" of confidential information obtained at Abbott. Indeed, Clavel's forwarding of confidential business documents, extensive use of external storage devices, repeated deception about accepting employment at Bio-Rad, and refusal to provide Abbott passwords to his devices all point to one inescapable inference: Clavel intends to use information from Abbott to perform his role at Bio-Rad.

77.     To protect the disclosure of confidential information about its future business strategies, Abbott seeks emergency and permanent injunctive relief (1) to prevent Clavel from disclosing any Abbott trade secrets or other proprietary or confidential business information to Bio-Rad or any third party; (2) to order Clavel to return all trade secrets or proprietary information to Abbott; and (3) to prevent Clavel from assuming any job responsibilities at Bio-Rad, which would risk him divulging Abbott's confidential competitive information.

78.     Through this Complaint, Abbott brings this action against Clavel for trade secret misappropriation in violation of the Defend Trade Secrets Act and Illinois Trade Secrets Act and breach of his Employee Agreement with Abbott.

**COUNT I: Violation of the Defend Trade Secrets Act (18 U.S.C. § 1836 *et seq.*)**

79.     Abbott re-alleges and incorporates by reference the allegations in paragraphs 1 through 78 as though fully set forth herein.

80.     Abbott's proprietary information and global business strategy concerning its future plans and its strategies, marketing, market-by-market demand planning, and financial models for COVID-19 and HIV products derive independent economic value to Abbott and are not known or readily ascertainable by competitors.

81.     Abbott maintains these trade secrets as confidential internally by limiting access to to individuals involved in the development, analysis, and implementation of these global business strategies. Abbott maintains documents and communications containing trade secrets and sensitive business information in password-protected devices and on limited-access Share Point drives accessible only to individuals involved in confidential Abbott business projects.

82.     Defendant Clavel is in possession of Abbott's trade secrets and confidential business information because of knowledge acquired through his role. In addition, he has acquired confidential and trade-secret information by forwarding emails to his personal Gmail account in violation of Abbott policy, and on information and belief, through improper means by extracting it from Abbott-owned property using USB storage devices.

83.     By acquiring Abbott's trade secrets through improper means, Defendant Clavel has misappropriated Abbott's trade secrets within the meaning of 18 U.S.C. § 1839(5).

84.     Defendant Clavel has failed to return Abbott's trade secrets and confidential information that he acquired.

85.     Based on Defendant Clavel's misrepresentations about his employment with Abbott's competitor Bio-Rad, Clavel intends to retain and use Abbott's trade secrets and confidential information to compete with or otherwise harm Abbott.

86.     The disclosure of Abbott's trade secrets will cause Abbott irreparable harm by undermining Abbott's competitive advantage in diagnostics testing, exposing its future business plans to competitors, and harming Abbott's competitive position related to COVID-19 and HIV testing products—two of the most competitive disease franchises in the clinical diagnostics fields. It also threatens to reveal Abbott's long-term plans for its Diagnostics businesses.

87.     Given the competition between Abbott and Bio-Rad and the comparable global marketing position Clavel has accepted, Clavel will inevitably disclose Abbott's trade secrets to a competitor.

88.     Abbott is entitled to the injunctive relief listed below to protect its confidential information and trade secrets, and to damages.

### COUNT II: Violation of the Illinois Trade Secrets Act (765 ILCS 1065/1)

89.     Abbott re-alleges and incorporates by reference the allegations in paragraphs 1 through 78 as though fully set forth herein.

90.     Abbott's proprietary information and long-term global Diagnostics business strategy, and its strategies, marketing, market-by-market demand planning, and financial models for COVID-19 and HIV products derive independent economic value to Abbott and are not known or readily ascertainable by competitors.

91.     Abbott maintains these trade secrets as confidential internally by limiting access to individuals involved in the development, analysis, and implementation of these global business strategies. Abbott maintains documents and communications containing trade secrets and sensitive business information in password-protected devices and on limited-access Share Point drives accessible only to individuals involved in confidential Abbott business projects.

92.     Defendant Clavel is in possession of Abbott's trade secrets and confidential business information because of knowledge acquired through his role. In addition, he has acquired confidential and trade-secret information by forwarding emails to his personal Gmail account in violation of Abbott policy, and on information and belief, through improper means by extracting it from Abbott-owned property using USB storage devices.

93.     By acquiring Abbott's trade secrets through improper means, Defendant Clavel has misappropriated Abbott's trade secrets within the meaning of the Illinois Trade Secrets Act.

94.     Defendant Clavel has failed to return Abbott's trade secrets and confidential information that he acquired.

95.     Based on Defendant Clavel's misrepresentations about his employment with Abbott's competitor Bio-Rad, Clavel intends to retain and use Abbott's trade secrets and confidential information to compete with or otherwise harm Abbott.

96.     The disclosure of Abbott's trade secrets will cause Abbott irreparable harm by undermining Abbott's competitive advantage in diagnostics testing, exposing its future business plans to competitors, and harming Abbott's competitive position related to COVID-19 and HIV testing products—two of the most competitive disease franchises in the clinical diagnostics fields. It also threatens to reveal Abbott's long-term vision for its entire Diagnostics line.

97.     Given the competition between Abbott and Bio-Rad and the comparable global marketing position Clavel has accepted, Clavel will inevitably disclose Abbott's trade secrets to a competitor.

98.     Abbott is entitled to the injunctive relief listed below to protect its confidential information and trade secrets.

## COUNT III: Breach of Contract

99.     Abbott re-alleges and incorporates by reference the allegations in paragraphs 1 through 78 as though fully set forth herein.

100.    The Employment Agreement is a valid and enforceable contract between Abbott and Defendant Clavel.

101.    Abbott has fully performed its obligations under the Agreement.

102.    Clavel has breached Section 6 of the Agreement by refusing to return Abbott equipment including his passwords to Abbott devices.

103.    Clavel has breached and/or will breach Section 8 of the Agreement by "us[ing] or disclos[ing], or assist[ing] in the disclosure to or use by others" Abbott's "Confidential Information" that he has acquired through downloading, accessing, and forwarding to his personal Gmail account, documents containing Abbott trade secrets.

104.    Moreover, by accepting employment at Bio-Rad, Clavel has breached or will breach Section 9 of the Agreement by "provid[ing] services to a Competing Business," and by "participat[ing] in developing or attempting to develop" competing products.

105.    Clavel's employment at Bio-Rad also violates the Agreement's prohibition on assuming another position that is "likely to result in the *use or disclosure* of Confidential Information" obtained through his role at Abbott.

106.    Abbott is entitled to the injunctive relief listed below to protect its confidential information and trade secrets.

## PRAYER FOR RELIEF

WHEREFORE, Abbott prays for the following injunctive and monetary relief:

(i)    On Count I, judgment in favor of Abbott, an order enjoining Clavel from assuming any position at Bio-Rad and from disclosing any trade secrets or proprietary information belonging to Abbott and ordering Clavel to return all Abbott property to Abbott immediately, and an award of monetary damages in an amount to be determined, together with pre-judgment and post-judgment interest on such amount;

(ii)    On Count II, judgment in favor of Abbott, an order enjoining Clavel from assuming any position at Bio-Rad and from disclosing any trade secrets or proprietary information belonging to Abbott and ordering Clavel to return all Abbott property to

Abbott immediately, and an award of monetary damages in an amount to be determined, together with pre-judgment and post-judgment interest on such amount;

(iii)    On Count III, judgment in favor of Abbott, an order enjoining Clavel from assuming any position at Bio-Rad and from disclosing any trade secrets or proprietary information belonging to Abbott and ordering Clavel to return all Abbott property to Abbott immediately, and an award of monetary damages but including at least the return of Clavel's signing bonus he forfeited by resigning from Abbott, together with pre-judgment and post-judgment interest on such amount; and

(iv)    An award of Abbott's costs, attorneys' fees, and expenses;

(v)    All such other relief as may be appropriate.


## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38(b), Abbott respectfully demands a trial by jury on all claims for damages.

Dated: October 30, 2020

/s/Rebecca Fitzpatrick
James F. Hurst, P.C.
Sierra Elizabeth (*pro hac vice pending*)
Rebecca Fitzpatrick
Patrick Weeks
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

*Attorneys for Plaintiff Abbott Laboratories*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on October 30, 2020 a true and accurate copy of the forgoing document was electronically filed with the CM/ECF system of the United States District Court for the Northern District of Illinois.  I also arranged for hand delivery of service on defendant this day.

*/s/ Rebecca Fitzpatrick*
Rebecca Fitzpatrick