**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **ABBOTT LABORATORIES,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Case No.  20-cv-06466** |
| ) | |
| **JEROME CLAVEL,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

**ABBOTT'S OPENING BRIEF IN SUPPORT OF ITS EMERGENCY MOTION
<u>FOR A TEMPORARY RESTRAINING ORDER</u>**

## TABLE OF CONTENTS

**Page**

**BACKGROUND**......................................................................................................**2**

    A.    Abbott's Diagnostics Businesses......................................................... 2

    B.    Abbott Hires Clavel as Global Marketing Vice President..................... 3

    C.    Clavel Participated in Cross-Functional, Highly Confidential Abbott Projects.............................................................................................. 4

    D.    Clavel Seeks Employment with Competitor in Violation of His Employee Agreement—And Lies About It—While Emailing Confidential Documents to Himself and Using Multiple Flash Drives...................................... 6

**ARGUMENT**.........................................................................................................**9**

**I.**    **Abbott Is Likely to Succeed on Its DTSA, ITSA, and Breach of Contract Claims**......................................................................................................**9**

    A.    Abbott Is Likely to Prevail on Its Defend Trade Secrets Act and Illinois Trade Secrets Act Claims. ...................................................................10

    B.    Abbott Is Likely to Prevail on Its Breach of Contract Claim...............15

**II.**    **Abbott Has No Adequate Remedy at Law and Will Suffer Irreparable Harm if Relief Is Not Granted.**........................................................................**17**

**III.**    **The Balance of Harms and Public Interest Favors Granting Emergency Relief to Abbott**.....................................................................................................**19**

**CONCLUSION**....................................................................................................**20**

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Allied Waste Servs. of N.A., LLC v. Tibble*,
    177 F. Supp. 3d 1103 (N.D. Ill. 2016) ................................................................................. 13

*Am. Transp. Grp., LLC v. Power*,
    2018 WL 1993204 (N.D. Ill. Apr. 27, 2018) ....................................................................... 16

*Aon Risk Servs. Companies, Inc. v. Alliant Ins. Servs., Inc.*,
    415 F. Supp. 3d 843 (N.D. Ill. 2019).......................................................................... 12, 18

*Brunswick Corp. v. Jones, Jr.*,
    784 F.2d 271 (7th Cir. 1986) ................................................................................10, 15, 19

*Cooper v. Salazar*,
    196 F.3d 809 (7th Cir. 1999) .................................................................................................9

*Eagle View Techs., Inc. v. Xactware Sol'ns, Inc.*,
    2019 WL 5304067 (D.N.J. Oct. 18, 2019)........................................................................... 18

*Eichman v. Nat'l Hosp. and Health Care Servs., Inc.*,
    719 N.E.2d 1141 (1st Dist. 1999) ....................................................................................... 16

*Lawrence and Allen, Inc. v. Cambridge Human Res. Grp., Inc.*,
    685 N.E.2d 434 (Ill. App. Ct. 1997)....................................................................................20

*Lucini Italia Co. v. Grappolini*,
    2003 WL 1989605 (N.D. Ill. Apr. 28, 2003) ...................................................................... 12

*Mickey's Linen v. Fischer*,
    2017 WL 3970593 (N.D. Ill. Sept. 8, 2017) .............................................................. *passim*

*Mintel Int'l Grp., Ltd. v. Neergheen*,
    2010 WL 145786 (N.D. Ill. Jan. 12, 2010) ........................................................................ 12

*Molon Motor & Coil Corp. v. Nidec Motor Corp.*,
    2017 WL 1954531 (N.D. Ill. May 11, 2017) ..................................................................... 10

*OptionsCity Software, Inc., v. Baumann*,
    2015 WL 3855622 (N.D. Ill. June 19, 2015) ................................................... 15, 16, 18, 19

*PepsiCo, Inc. v. Redmond*,
    1996 WL 3965 (N.D. Ill. Jan. 2, 1996)......................................................................... 18, 20

*PepsiCo, Inc. v. Redmond*,
    54 F.3d 1262 (7th Cir. 1995) ...................................................................12, 13, 15

*RKI, Inc. v. Grimes*,
    177 F. Supp. 2d. 859 (N.D. Ill. 2001) ........................................................ 16, 17

*Stericycle, Inc. v. Simota*,
    2017 WL 4742197 (N.D. Ill. Oct. 20, 2017) ....................................................16

*Surgipath Med. Indus., Inc. v. O'Neill*,
    2009 WL 10713821 (N.D. Ill. June 19, 2009) .............................................. 9, 19

*Tyler Enters. of Elwood, Inc. v. Shafer*,
    573 N.E.2d 863 (Ill. App. Ct. 1991).................................................................19

*Vendavo, Inc. v. Long*,
    397 F. Supp. 3d 1115 (N.D. Ill. 2019).................................................10, 11, 17

*Whitaker By Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*,
    858 F.3d 1034 (7th Cir. 2017) ...........................................................................9

*YCA, LLC v. Berry*,
    2004 WL 1093385 (N.D. Ill. May 7, 2004) .....................................................15

**Statutes**

765 ILCS 1065/3(a) .......................................................................................13

765 ILCS § 1065/2(d)(1)-(2) ...........................................................................11

18 U.S.C. § 1836(b)(3) ...................................................................................13

18 U.S.C. § 1839(3)........................................................................................11

**Rules**

Fed. R. Civ. P. 65(b) .....................................................................................1, 9

Plaintiff Abbott Laboratories, a market leader in diagnostic tests, moves for a temporary restraining order (TRO) under Fed. R. Civ. P. 65(b) to prevent Defendant Jerome Clavel from taking and disclosing Abbott's confidential information and valuable trade secrets—including critical parts of its global COVID-19 strategy and ██████████████████████████. This is not a case where a salesperson is moving between competitors. As a Vice President of Global Marketing, Clavel was responsible for marketing Abbott's rapid diagnostics products for infectious diseases in emerging markets, and participated on teams that prepared global marketing plans for key competitive business franchises, including COVID-19 and HIV. As a result, he had access to Abbott's confidential, trade-secret information about its current and future business plans in diagnostics.

After announcing his resignation from Abbott on October 15, 2020, purportedly for personal wellness reasons, Clavel *repeatedly lied* about the offer letter he *signed that same day* with Abbott's direct competitor in diagnostics, Bio-Rad Laboratories, Inc. After uncovering these lies several days later and demanding Clavel return his Abbott-owned computer, Abbott found the deception went deeper. The very same morning he surrendered it to Abbott, Clavel had connected the laptop to at least *five* external USB storage devices. He also refused to provide any password to his Abbott-owned devices for more than a week. Clavel then *lied again* in his exit interview with Abbott, denying the use of USB storage devices, a statement squarely contradicted by the limited forensic analysis Abbott has been able to perform. Nor did he mention that he had been forwarding emails containing Abbott's confidential information to his personal Gmail account. Clavel's conduct is in clear violation of the Defend Trade Secrets Act (DTSA), the Illinois Trade Secrets Act (ITSA), and the confidentiality and non-compete requirements of his Employment Agreement with Abbott.

Abbott brings this motion for a temporary restraining order to immediately halt Clavel's pattern of deception, to compel him to return all Abbott property, including all trade secrets and confidential information, and to stop Clavel's clear violations of his Employment Agreement. This relief is necessary to prevent the irreparable harm to Abbott that would result from Clavel's efforts to use Abbott's confidential and trade-secret information as a top diagnostics marketing executive for a direct competitor.

## BACKGROUND

For purposes of this motion, Abbott hereby incorporates all facts stated in the accompanying witness declarations.

### A. Abbott's Diagnostics Businesses.

Abbott is a global healthcare company creating breakthrough products across four business units—diagnostics, medical devices, nutrition, and branded generic pharmaceuticals. Abbott's diagnostics businesses offer a diverse array of tests that provide crucial information to help inform treatment decisions for hundreds of health conditions. As a general matter, Abbott offers diagnostic tests across three focus areas: Core Laboratory, Molecular, and Rapid Diagnostics. "Rapid" tests are analyzed at the point of care (e.g., a doctor's office), while "Core Laboratory" tests are analyzed in hospital, laboratories, and clinics. "Molecular" refers not to where tests are analyzed, but what they analyze: DNA, RNA, and proteins at the molecular level. The three focus areas often operate independently, but where Abbott has testing products that span across two or more categories, they can also work in conjunction on a unified "One Abbott" strategy to meet market needs, the most prominent example of which is Abbott's response to COVID-19.

**B.      Abbott Hires Clavel as Global Marketing Vice President.**

Abbott hired Clavel on April 25, 2019 as Vice President of Global Marketing for the Infectious Disease Emerging Markets (IDEM) segment. (*See* Ex. A.) In this role, Clavel identified market opportunities and marketing strategies for Abbott's key business franchises for IDEM, including HIV, hepatitis, and malaria. Clavel also had a broader role, serving on cross-functional "One Abbott" groups that developed strategic plans for both Abbott's full range of COVID-19 and HIV diagnostic products—Abbott's "go-to-market" playbooks—and for long-term strategic planning across Abbott's Diagnostics businesses.

As part of his employment with Abbott, Clavel signed an Employment Agreement containing a covenant to protect Abbott's confidential information:

> 8. **Non-Disclosure of Confidential Information.** EMPLOYEE acknowledges and agrees that EMPLOYEE has no right, title or ownership in Confidential Information … *shall use all best efforts to protect the secrecy and confidentiality of all Confidential Information*, including, as applicable, such efforts and measures as set forth in ABBOTT policies, procedures and guidelines. EMPLOYEE shall not, during the term of employment with ABBOTT or thereafter, use or disclose…directly or indirectly, any Confidential Information, except as required and authorized in the scope of EMPLOYEE's job responsibilities and in the furtherance of ABBOTT's business (to the extent consistent with applicable confidentiality obligations between ABBOTT and third parties).

(*See* Ex. B, § 8 (emphasis added).) The Agreement also contains a non-compete provision barring Clavel from employment in a similar role with an Abbott competitor for 12 months following his employment with Abbott:

> 9. **Non-Competition.** EMPLOYEE shall not, during EMPLOYEE's employment and twelve (12) months after EMPLOYEE's termination for any reason, in each country in which ABBOTT conducts business, except as expressly authorized in writing in advance by the ABBOTT Divisional Vice President & Associate General Counsel, Litigation or his/her designee:

3

(a) participate in, manage, supervise, or provide services to a Competing Business: (i) that are the same as or similar in function or purpose to any services EMPLOYEE provided to ABBOTT during the last two years of EMPLOYEE's employment with ABBOTT; or (ii) that are otherwise likely to result in the use or disclosure of Confidential Information, notwithstanding EMPLOYEE's undertaking to the contrary;

…

(c) participate in developing or attempting to develop a Competing Product;

(d) directly or indirectly, promote or market any Competing Products to any ABBOTT Customer, or solicit any ABBOTT Customer or Covered Supplier for any purpose related to Competing Product.

(*Id.* § 9.)

## C. Clavel Participated in Cross-Functional, Highly Confidential Abbott Projects.

Clavel's global marketing position is not confined to the IDEM Rapid Diagnostics business unit. Indeed, since joining Abbott in 2019, Clavel has been involved in several projects involving collaboration between Abbott's Core Laboratory, Molecular, and Rapid Diagnostics business units to plan the short- and long-term future of Abbott's key products, and Abbott's Diagnostics businesses as a whole.

***First***, Clavel was part of the team that developed Abbott's COVID-19 market entry strategy, spending months developing market assessment models aimed at anticipating the evolving public health demands across the globe and guiding Abbott's product innovation strategy. (Ex. I, Ayvazian Decl ¶¶ 6-7.) Since the onset of the global pandemic, Abbott's Core Laboratory, Molecular, and Rapid Diagnostics business units have worked together to bring substantial resources to bear on producing and distributing testing across the world. (*Id.* ¶¶ 2-4.) This year Abbott has launched nine different COVID-19 tests, including three targeting molecular DNA and RNA, two targeting antigens, two serology tests targeting antibodies, and two Panbio tests offered

outside the United States. (*Id.* ¶ 13.) █████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

████████████████████████████████████ (*See id.* ¶ 7.)

As the Vice President of Marketing for a key segment of Abbott's Diagnostics business, Clavel participated as part of the "core group" in both developing and executing the strategic plans for this One Abbott approach to COVID-19. (*Id.* ¶¶ 10-12.) Not only was he on the team that created internal strategic plans influencing Abbott's global market entry tactics and COVID-19 product pipeline, he helped assemble ████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████. In short, he knows Abbott's comprehensive go-to market playbook on COVID-19.

***Second***, Clavel was responsible for marketing one of Abbott's most important pre-COVID-19 products: HIV diagnostics. (*See id.* ¶ 36; Ex. J, Halloran Decl. ¶ 11.) ███████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████ (*Id.* ¶ 11.) Accordingly, Clavel knows Abbott's pipeline of products, planned launches, and pricing strategies, ██████████████████████

███████████████████████████████████████████████████████████████████████

████████████████████████████████████ These plans likewise cut across Abbott's HIV products, from Rapid Diagnostics to Core Laboratory and Molecular.

*Third*, ████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

### D. Clavel Seeks Employment with Competitor in Violation of His Employee Agreement—And Lies About It—While Emailing Confidential Documents to Himself and Using Multiple Flash Drives.

Clavel sought employment with Bio-Rad Laboratories, an undisputed Abbott competitor. (*See* Ex. K, Kroc Decl. ¶ 13; Ex. I, Ayvazian Decl. ¶ 40.) Indeed, Bio-Rad's own 2019 Annual Report cites Abbott as the second "major competitor" of its "Clinical Diagnostics segment." (Ex. C, Bio-Rad 2019 Annual Report.) More specifically, Bio-Rad's COVID-19 and HIV tests compete head-to-head with Abbott's offerings. (*See* Ex. J, Halloran Decl. ¶ 12; Ex. I, Ayvazian Decl ¶ 43; Ex. L, Palm Decl. ¶¶ 18-20.) In addition, Bio-Rad sells critical components of Core Laboratory products—analyzers, tests, calibrators, and controls—all of which compete directly with Abbott's Diagnostics businesses. (Ex. I, Ayvazian Decl. ¶ 44.) Undeterred by an unambiguous non-compete provision in his Employment Agreement, on October 15, 2020, Clavel signed an offer letter from Bio-Rad to serve as a VP of Marketing for Bio-Rad's Clinical Diagnostics Group. (*See* Ex. D, 10/15/2020 Bio-Rad Letter to Clavel.)

Tellingly, Clavel then lied to Abbott about his new job on at least three occasions.

- In an October 15, 2020 communication, Clavel reported to his supervisor and an Abbott HR Director that "*I haven't signed on with any job at this point*. . ." (Ex. E, 10/15/2020 Email from J. Clavel (emphasis added); Ex. K, Kroc Decl. ¶ 12; Ex. J, Halloran Decl. ¶ 8.) He signed his Bio-Rad offer letter *that very same day*. (*See* Ex. D, 10/15/2020 Bio-Rad Letter to Clavel.)

- He next lied to a coworker from the legal department four days later, claiming he "ha[s] a couple options" for employment. (Ex. F, 10/19/2020 Text from J. Clavel.)

- And when Abbott uncovered his misrepresentations a few days later and called to inquire, he told Abbott's HR Director again—falsely—*he had "not signed anything, and is still interviewing*." (*See* Ex. K, Kroc Decl. ¶ 18.)

Unwilling to trust an employee who repeatedly lied, Abbott directed Clavel to return his Abbott-owned laptop and iPhone on October 20, 2020. (*Id.* ¶ 20.) Even after turning his devices over, Clavel refused requests for his passwords, only handing the passwords over less than a week before his new job's start date. (*Id.* ¶ 28.)

It is now clear why. Abbott's forensic investigation of Clavel's devices reveals that for months he forwarded internal Abbott emails to his personal Gmail account, at least some of which contained confidential Abbott trade secrets. For example, Clavel forwarded to his personal Gmail account emails containing highly confidential demand forecasts and market assumptions for Abbott's COVID-19 Panbio test. (*See* Ex. G, Email from J. Clavel.) Clavel also connected his computer to external USB storage devices several times in the months leading up to his departure, and the limited forensic data available already demonstrates that he saved multiple Abbott documents to these drives. (*See* Ex. H, Thauer Aff. ¶ 16.) Most disturbingly, Abbott's investigation revealed that on October 20, 2020, the day he surrendered his Abbott-owned devices, Clavel connected his Abbott computer to *five different USB storage devices*. (*Id.* ¶ 15.) In other words, Clavel could have taken hundreds of gigabytes worth of data from Abbott on this day alone. But

because Clavel refuses to even admit to using these devices, Abbott cannot know for sure exactly what they contain.

Moreover, Abbott has now learned that Clavel appears to have taken documents from a past employer. Abbott's investigation of Clavel's laptop revealed that one of his personal USB storage devices contained a folder called "Jerome [Previous Employer] Backup," which held files that appear to be from his previous employer, with titles like "StratPlan 2016." (Ex. H, Thauer Aff. ¶ 25.) Although Abbott cannot know the full contents, Clavel has a similar backup folder on the same personal USB device: "Oct 20 Backup," curiously the same month he resigned from Abbott. (*Id*. ¶ 21.)

At his exit interview on October 28—almost two weeks after he signed the offer letter—Clavel finally admitted that he had accepted a job at Bio-Rad. (Ex. K, Kroc Decl. ¶ 23.) His start date is November 2. (*Id*.) Abbott HR then asked Clavel about the nature of the job. (Ex. K, Kroc Decl. ¶ 24.) He first said that he did not know the products Bio-Rad had for him, a claim that strains credulity. (*Id*.) When asked about COVID-19 and HIV specifically, he then asserted that he simply would not be working on Bio-Rad's clinical diagnostic COVID-19 and HIV tests. (*Id*. ¶ 25.) That too is absurd. He is to be Vice President of Marketing for Bio-Rad's Clinical Diagnostics Group, a job for which he is being paid a █████████████████████████████ ████████████████████████ (Ex. D, 10/15/2020 Bio-Rad Letter to Clavel.) Contrary to his claim that a separate business unit at Bio-Rad is responsible for COIVD-19 tests, Bio-Rad's Clinical Diagnostics website currently features its COVID-19 products front and center. (Ex. K, Kroc Decl. ¶ 29.) And this limitation appears nowhere in his Bio-Rad offer letter. (*Id*.) Furthermore, when asked what precautions he and Bio-Rad would take, Clavel disclaimed any

firewalls or other procedures—he claimed he would simply avoid the topic of his Abbott work. (*Id.* ¶ 26.)

After Clavel's pattern of lies, his use of external storage devices while denying their use, his refusals to provide passwords to Abbott-owned devices, his apparent past practice of taking confidential documents from employers, and his unsupported assurance that he would not work on two of Bio-Rad's key diagnostics product lines, Abbott has no choice but to bring this motion for temporary relief to stop Clavel from absconding to a competitor with Abbott's confidential information and trade secrets.

## ARGUMENT

A TRO should issue pursuant to Rule 65(b) where an applicant demonstrates: (1) likelihood of success on the merits; (2) the absence of an adequate remedy at law; and (3) that it will suffer irreparable harm absent a TRO. *See, e.g.*, *Surgipath Med. Indus., Inc. v. O'Neill*, 2009 WL 10713821, at *2, *6 (N.D. Ill. June 19, 2009). Once this showing is made, courts balance the plaintiff's harm if relief is wrongfully denied against the defendant's harm if relief is wrongfully granted and determine whether the TRO will harm the public interest. *Id.* Each of these considerations weighs heavily in favor of granting Abbott's TRO to stop Clavel from beginning work at Bio-Rad and disclosing Abbott's trade secrets. In fact, this case presents the model scenario for a TRO: an employee acquired the employer's competitive playbook and plans to take it to a direct competitor.

## I. Abbott Is Likely to Succeed on Its DTSA, ITSA, and Breach of Contract Claims.

To obtain emergency injunctive relief, a movant "need not demonstrate a likelihood of absolute success on the merits. Instead, he must only show that his chances to succeed on his claims are 'better than negligible.'" *Whitaker By Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1046 (7th Cir. 2017) (quoting *Cooper v. Salazar*, 196 F.3d 809, 813 (7th

Cir. 1999)). As the Seventh Circuit has explained, "this is a relatively low bar." *Vendavo, Inc. v. Long*, 397 F. Supp. 3d 1115, 1129 (N.D. Ill. 2019); *Brunswick Corp. v. Jones, Jr.*, 784 F.2d 271, 277 (7th Cir. 1986) (affirming grant of preliminary injunction). The evidence assembled on each of Abbott's claims far exceeds this standard.

> **A.      Abbott Is Likely to Prevail on Its Defend Trade Secrets Act and Illinois Trade Secrets Act Claims.**

Trade secret protection statutes are designed precisely to prevent employees with access to innovative technology and non-public market analyses from divulging sensitive business information to an industry competitor. The Defend Trade Secrets Act and the Illinois Trade Secrets Act prohibit the unfair competition—and irreparable harm to business interests—that results from senior employees absconding with documents and business strategies that require substantial investment, creative innovation, and countless employee hours to develop.

That is exactly what Clavel is trying to do here, in clear violation of the DTSA and ITSA: he improperly acquired documents and information concerning Abbott's One Abbott COVID-19 strategic playbook, its plans for how to penetrate markets and capture share in HIV products, ████ ████████████████████████████████████████████ Now he wants to bring that knowledge and information with him to a company that considers Abbott a top competitor. (*See* Ex. C, Bio-Rad 2019 Annual Report, at 5.) There is no question Abbott has a convincing claim for misappropriation of its trade secrets here. *See Molon Motor & Coil Corp. v. Nidec Motor Corp.*, 2017 WL 1954531, at *3 (N.D. Ill. May 11, 2017) (ITSA claim requires (1) the existence of trade secret; and (2) actual or threatened misappropriation). In fact, Abbott can successfully obtain injunctive relief under *either* the DTSA *or* ITSA for a "threatened" misappropriation of trade secrets under the "inevitable disclosure" doctrine, if a defendant's new employment will inevitably lead to relying on the plaintiff's trade secrets. *See, e.g.*, *Mickey's Linen v. Fischer*, 2017 WL

3970593, at *12 (N.D. Ill. Sept. 8, 2017). Abbott easily meets this "low bar" here. *Vendavo*, 397 F. Supp. 3d at 1129.

*First*, Abbott's confidential business strategies and non-public technologies are plainly trade secrets because Abbott "derive[s] economic value, actual or potential, from [the business plans and innovation strategies] not being generally known to other persons who can obtain economic value from its disclosure or use," and Abbott uses "efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality." 765 ILCS § 1065/2(d)(1)-(2); *see also* 18 U.S.C. § 1839(3) (similar). To begin, the One Abbott COVID-19 and HIV plans represent cutting-edge product solutions that distinguish Abbott from any other diagnostic provider in the market right now. (*See* Ex. I, Ayvazian Decl. ¶ 7.) For instance, Abbott has spent months developing the cross-divisional business plan designed to leverage all of its testing and market deployment expertise in order to deliver customized and comprehensive COVID-19 solutions. (*See id*. ¶¶ 5–7.) To achieve this, Abbott performed market assessments to develop market entry plans, anticipate shifting demand as the pandemic evolved, develop its pricing strategies, decide when and where to launch products, and inform its investments in new product innovation. (*See id*. ¶¶ 20–22, 25.) These strategies were not developed overnight, nor can they be easily replicated without the cross-divisional expertise and investment Abbott poured into designing world-class diagnostic solutions. Indeed, for the last six months, Abbott has devoted substantial financial resources to generating its novel One Abbott framework to distinguish itself in the market. Clavel was a central figure in developing these plans. And there is no question that Abbott's competitors, including Bio-Rad, are moving as fast as they can to expand their offerings and emulate Abbott's approach. (*Id*. ¶ 33.)

Clavel likewise participated in discussions regarding ████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████████████████████████████████████ (*Id.* ¶

9.) Taking Abbott's business plans and strategy playbooks straight to another diagnostic competitor could save that competitor millions of dollars and months, if not years, of project development time. These forward-facing strategic plans and documents are the exact type of trade secrets the law is designed to protect.

The Seventh Circuit's *PepsiCo* decision is instructive. In *PepsiCo*, the exiting employee walked out with Pepsi's annual "Strategic Plan," containing its plans to compete, its financial goals, and its strategies for manufacturing, production, marketing, packaging, and distribution for the coming three years. *PepsiCo, Inc. v. Redmond*, 54 F.3d 1262, 1265 (7th Cir. 1995). Like the COVID-19, HIV, and long-term business plans at Abbott, Pepsi's Strategic Plan "derives much of its value from the fact that it is secret and competitors cannot anticipate [Pepsi's] next moves." *Id.* Other courts have routinely held that "market strategies" and similar product development plans not disclosed to the public constitute trade secrets. *See, e.g., Mickey's Linen*, 2017 WL 3970593, at *9 ("pricing" and "marketing strategies"); *Mintel Int'l Grp., Ltd. v. Neergheen*, 2010 WL 145786, at *11 (N.D. Ill. Jan. 12, 2010) ("marketing activities, projects, and initiatives"); *Lucini Italia Co. v. Grappolini*, 2003 WL 1989605, at *16 (N.D. Ill. Apr. 28, 2003) ("design and marketing plans").

**Second**, Abbott can show Clavel has misappropriated Abbott's trade secrets by acquiring them through improper means. *See Aon Risk Servs. Companies, Inc. v. Alliant Ins. Servs., Inc.*, 415 F. Supp. 3d 843, 848 (N.D. Ill. 2019) (granting TRO where employee took "data compilations,

12

proprietary tools … and intellectual property"). Here, just six days before signing his offer letter with Bio-Rad and submitting his resignation, Clavel forwarded to his Gmail account confidential business documents containing forecasts analyzing potential customers and estimating demand in specific markets for Abbott's COVID-19 products. (*See* Ex. G, Email from J. Clavel; Ex. K, Kroc Decl. ¶ 13.) Moreover, on the same day Abbott instructed Clavel to turn over his Abbott-owned computer and other devices, Clavel used *five separate USB storage devices* on his Abbott laptop. There is no legitimate business reason for that behavior. These combined storage devices could have extracted hundreds of confidential Abbott business documents while avoiding any detection from forensic computer records. (Ex. H, Thauer Aff. ¶¶ 11-12.) Making matters worse, Clavel refuses to even admit that he used such devices. (Ex. K, Kroc Decl. ¶ 27.); *accord Allied Waste Services of N.A., LLC v. Tibble*, 177 F. Supp. 3d 1103, 1102 (N.D. Ill. 2016) (denying motion to dismiss ITSA claims where defendant emailed his employer's "confidential information to his personal email address shortly before his employment ended").

Independently, the Court should enjoin Clavel from using or disclosing Abbott's trade secrets under the doctrine of "inevitable disclosure." *See* 18 U.S.C. § 1836(b)(3); 765 ILCS 1065/3(a); *Mickey's Linen*, 2017 WL 3970593, at *12; *PepsiCo*, 54 F.3d at 1269. "The factors to determine whether disclosure of trade secrets is inevitable are: 1) the level of competition between the former employer and the new employer; 2) whether the employee's position with the new employer is comparable to the position he held with the former employer; and 3) the actions the new employer has taken to prevent the former employee from using or disclosing trade secrets of the former employer." *E.g.*, *Mickey's Linen*, 2017 WL 3970593, at *12.

Here, Clavel has accepted a nearly identical global marketing position with Bio-Rad Laboratories that will involve making strategic business decisions aimed at copying Abbott's

success for Bio-Rad. For instance, in response to the COVID-19 pandemic, Bio-Rad has released a Core Laboratory diagnostic test (to be run in a laboratory) in addition to an antibody test designed for its proprietary testing platform (or for manual use). These products compete directly with Abbott in the highly competitive and rapidly evolving COVID-19 testing market. (Ex. I, Ayvazian Decl. ¶ 43.) The companies also compete on HIV rapid tests. Bio-Rad's Genie™ Fast HIV 1/2 Rapid test is a rapid, lateral flow HIV test given at the point of care—the same sort of HIV test that Abbott has. (Ex. L, Palm Decl. ¶ 20.) Before COVID-19, █████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

(*See* Ex. J, Halloran Decl. ¶ 11.) Clavel's position within Bio-Rad's Clinical Diagnostics Group will thus involve developing marketing and business execution strategy related to COVID-19 and HIV, the exact thing he had been doing for Abbott.

Likewise, Clavel might leverage his experience at Abbott developing long-term strategic plans and building a cross-divisional marketing strategy—and any accompanying models, marketing materials, or strategy playbooks he took from Abbott—to boost Bio-Rad's wide-reaching Core Laboratory business. (*See* Ex. L, Palm Decl. ¶ 17.) Moreover, knowing Abbott's projected launch dates for new technology could provide a roadmap for a competitor like Bio-Rad to undercut Abbott's advantage by securing low-bid, long-term contracts to lock Abbott out of certain markets for years. (*Id.*) ███████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████████████████ (*See id.* ¶¶ 15, 17.)

Unless Clavel "possesse[s] an uncanny ability to compartmentalize information, he would necessarily be making decisions about" Bio-Rad products competing with Abbott products "by

relying on his knowledge of [Abbott's] trade secrets." *PepsiCo*, 54 F.3d at 1269; *see also YCA, LLC v. Berry*, 2004 WL 1093385, at *15 (N.D. Ill. May 7, 2004) ("[T]his sensitive marketing data … has now become part of [the employee's] general knowledge which the Court cannot expect him simply to forget."). Nor has Clavel ever provided any credible indication that he *would not* disclose the trade secrets or highly-confidential business strategies he learned at Abbott. To the contrary, Clavel has spent the last 14 days lying to Abbott about his new job and connecting flash drives to his Abbott computer. All of this conduct points to an inescapable conclusion: Clavel intends to use Abbott's secret, competitive information in his new job at Bio-Rad. *See PepsiCo, Inc.*, 54 F.3d at 1270 (employee's lack of forthrightness in the time period between when he accepted job and when he resigned "demonstrated a lack of candor . . . and proof of [his] willingness to misuse . . . trade secrets"); *accord Mickey's Linen*, 2017 WL 3970593, at *13 ("history of deceit" contravened employee's claim they would not divulge trade secrets).

**B.    Abbott Is Likely to Prevail on Its Breach of Contract Claim.**

Abbott's likelihood of success is also substantially "better than negligible" where Clavel has breached the plain terms of his Employment Agreement. *Brunswick*, 784 F.2d at 275. Here, Abbott and Clavel executed a valid contract, Abbott performed its obligations under the Agreement, Clavel breached the non-compete provision by accepting a marketing position with Bio-Rad in Diagnostics, and Clavel's breach will cause Abbott harm. *See OptionsCity Software, Inc., v. Baumann*, 2015 WL 3855622, at *3 (N.D. Ill. June 19, 2015) (granting TRO based on breach of employment agreement).

By signing his Employment Agreement with Abbott, Clavel agreed to an unambiguous provision: he would not—for 12 months after leaving employment at Abbott—perform services "the ***same as or similar in function or purpose***" to any services he provided to Abbott. (*See* Ex. B, Employment Agreement § 9(a) (emphasis added).) Yet Clavel intends to assume a top global

marketing position at a company that considers Abbott its *second-largest* competitor. (*See* Ex. C, Bio-Rad Annual Report, at 5.) In short, Clavel seeks to substitute his global marketing position at Abbott for another at Bio-Rad where he will inevitably execute strategic marketing decisions with respect to products that compete directly with Abbott. (*See supra*, at 6.) That is a breach of the Agreement. And it is the very same competitively damaging conduct Abbott sought to avoid by negotiating the provision in the first place.

Illinois courts uphold noncompetition agreements "which protect the employer's legitimate proprietary interests" that do not harm competition. *See, e.g., Eichman v. Nat'l Hosp. and Health Care Servs., Inc.*, 719 N.E.2d 1141, 1147 (1st Dist. 1999); *RKI, Inc. v. Grimes*, 177 F. Supp. 2d. 859, 878 (N.D. Ill. 2001) ("A restrictive covenant may be enforced if the employee learned trade secrets or other confidential information while in the plaintiff's employ and subsequently attempted to use it for his own benefit."). Moreover, the provision here restricting Clavel's employment performing "same" or "similar" services for a competitor is far more reasonable than other terms upheld by Illinois courts. *See, e.g., OptionsCity Software, Inc.*, 2015 WL 3855622, at *5 (18-month non-compete period was reasonable); *Am. Transp. Grp., LLC v. Power*, 2018 WL 1993204, at *5 (N.D. Ill. Apr. 27, 2018) (activity restriction limited to competitive activity not unreasonable as a matter of law). Nor is there any failure of consideration to the Agreement where Clavel voluntarily terminated his employment after approximately 18 months working at Abbott. *Accord Stericycle, Inc. v. Simota*, 2017 WL 4742197, *5 (N.D. Ill. Oct. 20, 2017) (applying fact-specific inquiry and holding 13 months is adequate); *Tibble*, 177 F. Supp. 3d at 1109 (applying "flexible test" and finding 15 months is adequate consideration). In short, Clavel executed a valid, enforceable contract with Abbott, and his proposed employment at Bio-Rad would be a patent breach of those obligations.

Even if Clavel had not breached the non-compete provision by accepting the same job with a competitor (which he has), Clavel further breached the Employment Agreement's provisions barring employees from disclosing Abbott's confidential information. The Agreement plainly prohibits Clavel, "during the term of employment with Abbott *or thereafter*," from "us[ing] or disclos[ing], or assist[ing] in the disclosure to or use by others … *any Confidential Information*." (Ex. B, Employment Agreement § 8 (emphasis added).) The Agreement broadly defines "Confidential Information" as "information … provided to employee while employee *in any form* … that is not *generally known to the public* by proper means. (*Id*. § 2(d) (emphasis added).) There is no doubt that Clavel has breached this provision, not only by forwarding and apparently downloading Abbott's confidential information in documentary form, but also by absconding with his knowledge of Abbott's proprietary business strategies, including its One Abbott COVID-19 and HIV business plans, all of which Abbott designed to shore up its competitive position and lead the market into the next generation of diagnostic solutions. *See, e.g.*, *RKI, Inc.*, 177 F. Supp. 2d at 878 (finding employee breached non-disclosure agreement when employee "used or tried to use the confidential information" he downloaded from employer).

## II. Abbott Has No Adequate Remedy at Law and Will Suffer Irreparable Harm if Relief Is Not Granted.

Disclosing Abbott's trade secrets would cause irreparable harm to Abbott's future business strategy and key product lines—no amount of damages can remedy this. *E.g.*, *Vendavo*, 397 F. Supp. 3d at 1143 ("[T]here is 'a presumption of irreparable harm to the plaintiff in cases of trade secret misappropriation.'") (citation omitted). Most glaringly, Bio-Rad offers rapid testing and core laboratory products that compete directly with Abbott's key diagnostic solutions for COVID-19 and HIV, products that Clavel was central to marketing. (Ex. J, Halloran Decl. ¶ 12.) Disclosure of Abbott's long-term plans could move a competitor forward by months or years. Accordingly,

any information acquired by or shared with Bio-Rad in these highly-competitive diagnostics markets would irreversibly harm Abbott by, at minimum, allowing a competitor to develop a plan to seek market share from Abbott. *See, e.g.*, *Eagle View Techs., Inc. v. Xactware Sol'ns, Inc.*, 2019 WL 5304067, at *2 (D.N.J. Oct. 18, 2019) (loss of market share relevant to showing irreparable harm). Abbott could never "unring [the] bell" of losing its innovation edge in a highly competitive industry. *See, e.g.*, *PepsiCo, Inc. v. Redmond*, 1996 WL 3965, at *30 (N.D. Ill. Jan. 2, 1996) ("[J]ust as it is impossible to unring a bell, once disclosed, trade secrets and confidential information lose their secrecy forever[.]").

That is why Illinois courts presume irreparable harm when the harm involves the disclosure of trade secrets. *See, e.g.*, *Aon Risk Servs.* 415 F. Supp. 3d at 848 ("'there is a presumption of irreparable harm to the plaintiff in cases of trade secret misappropriation'") (citation omitted); *PepsiCo, Inc.*, 1996 WL 3965, at *29-30 ("In cases such as this, involving threats to trade secrets and confidential information, courts readily presume irreparable injury from a showing that the protectable interest at stake is imperiled by a defendant's conduct.").

Aside from the devastating impact of divulging its COVID-19 and HIV playbooks and innovative long-term strategy, Clavel contractually agreed that Abbott will suffer "irreparable injury" and "shall be entitled to injunctions enjoining [any] breach or threatened breach" of the non-compete provision or disclosure of Abbott's trade secrets. (Ex. B, § 9(d)); *see also OptionsCity Software, Inc.*, 2015 WL 3855622, at *5 (relying on employee's agreement that breach would cause irreparable harm). Thus, irreparable harm to Abbott can be presumed by Clavel's employment with a direct competitor in breach of his covenant. *See Mickey's Linen*, 2017 WL 3970593, at *18 ("Both federal and Illinois law . . . treat 'ongoing competition itself as a sufficient

18

basis for relief.'") (citation omitted); *accord Tyler Enters. of Elwood, Inc. v. Shafer*, 573 N.E.2d 863, 866-67 (Ill. App. Ct. 1991).

### III.     The Balance of Harms and Public Interest Favors Granting Emergency Relief to Abbott.

Protecting Abbott's trade secrets from disclosure—information Clavel acquired improperly and without authorization—does not harm Clavel at all. *See, e.g.*, *Surgipath Med.*, 2009 WL 10713827, at *6 (granting TRO where "defendant presented no evidence of the harm he would suffer if the TRO were granted"). Nor does stopping Clavel from violating the provisions of an Employment Agreement he voluntarily signed. Abbott permits employees to move to competitors all the time so long as there are reasonable protections in place to avoid competitive harm to Abbott. That is why Abbott negotiates provisions to prevent senior employees from taking positions that are the "same as or similar in function or purpose" to the services provided to Abbott. *See Brunswick Corp.*, 784 F.2d at 275 (restraining employee from working for "another competitor" not irreparable harm); *see also OptionsCity Software, Inc.*, 2015 WL 3855622, at *4-5 (granting temporary restraining order despite defendant's representation that the non-compete would "effectively preclude[] him from employment within his chosen field"). Clavel is a marketing executive with access to Abbott's innovative strategies and playbook for the future of its Diagnostics business. Where Clavel has already taken sensitive business documents and repeatedly lied to Abbott about his plans to work for a competitor, there is no harm caused by ordering him to abide by the contractual terms he agreed to.

Conversely, as outlined above, Abbott could be severely and irreparably harmed if its confidential business strategy were revealed to a direct competitor or if its ███████████ ███████████ were revealed to a competitor prematurely. *See Brunswick Corp.*, 784 F.2d at 275 ("balance of irreparable harms weigh[ed] heavily" in employer's favor because employee's

information would, among other things, "permit a competitor to preempt [the employer's] new products before they reached the market" and "to determine how aggressively it should price its products").

Likewise, the public interest tips the balance heavily for Abbott, as the public favors fair, competitive practices. *PepsiCo, Inc.*, 1996 WL 3965, at *32 (granting preliminary injunction to further "vital public interests," including "fair competition, business innovation and economic efficiency"); *accord Lawrence and Allen, Inc. v. Cambridge Human Res. Grp., Inc.*, 685 N.E.2d 434, 443 (Ill. App. Ct. 1997) (no injury to the public in highly competitive industry). Indeed, during a global pandemic the public benefits significantly when medical diagnostics providers compete vigorously—but fairly—to continue developing best-in-class solutions to address the evolving threat of COVID-19.

## CONCLUSION

For the foregoing reasons, Abbott respectfully requests the Court grant its motion for a temporary restraining order and all other relief the Court deems appropriate.

Dated: October 30, 2020

*s/ Rebecca Fitzpatrick*
James F. Hurst, P.C.
Rebecca Fitzpatrick
Sierra Elizabeth (*Pro Hac Vice Pending*)
Patrick Weeks
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

*Attorneys for Plaintiff Abbott Laboratories*

**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that on October 30, 2020 a true and accurate copy of the forgoing document was electronically filed with the CM/ECF system of the United States District Court for the Northern District of Illinois. I also arranged for hand delivery of service on defendant this day.

*<u>/s/ Rebecca Fitzpatrick</u>*
Rebecca Fitzpatrick
