IN THE UNITED STATES DISTRICT COURT
FOR THE NOTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ABBOTT LATORATORIES )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>JEROME CLAVEL, )<br>)<br>Defendant. ) | Case No. 20-CV-06466 |

### DEFENDANT JEROME CLAVEL'S RESPONSE TO PLAINTIFF ABBOTT LABORATORIES' REQEUST FOR A TEMPORARY RESTRAINING ORDER (TRO)

### INTRODUCTION

Defendant Jerome Clavel (Defendant or Clavel), represented by Abrahamson Vorachek & Rdzanek, hereby requests that Plaintiff Abbott Laboratories' (hereafter Abbott) motion for the temporary restraining order (TRO) under FRCP 65 (b) be denied because he has not sought to disclose their confidential information and trade secrets to his new employer Bio-Rad. To the contrary, he took pains to avoid. any such event from occurring.

While employed by Abbott as Vice President of Global Marketing, Mr. Clavel's job was primarily focused on point-of-care delivery outside of the United States, where delivery is often outside of the main delivery locations common in the United States. (*See* Declaration of Defendant Jerome Clavel, attached hereto as Exhibit A, ¶3.) He worked hard at his job, working weekends and long and late hours regularly, in addition to being required to work every day of his vacations (*Id.* ¶4). Unfortunately, this demanding workload was made even more difficult by an abusive work environment. (*Id.*) This eventually began to affect his health. (*Id.*) By the second year of his

employment, he made the decision that he had to leave this environment due to his health, but he was concerned for the financial impact upon his family as he had received a sign-on bonus with a repayment clause, and he had worked most of the year and would normally receive an annual bonus. (*Id.* ¶7) He raised his harassing work environment and the impact on his health as well as his concerns about the financial impact of leaving with Abbott's HR, and was assured that Abbott did not enforce its repayment clauses, and that a bonus was likely given that he had worked most of the year. (*Id.*)

Even though Mr. Clavel needed to leave Abbott, he took pains to ensure that Abbott's confidential and trade secrets were protected and that nothing would transfer through him to Bio-Rad. He checked Abbott's internal lists, and Bio-Rad was not named as a competitor. (*Id.* ¶12) When he interviewed with Bio-Rad, he proactively provided them a copy of his Employment Agreement. He was assured that there was no problem and that he would not be asked to work in any area that he had worked on while at Abbott. *Id*. He, however, went further and asked that Bio-Rad insert in his job offer letter an assurance that any area would be sealed off if later discovered. *Id*. Bio-Rad amended the offer letter to assure Mr. Clavel that Bio-Rad, too, was committed to not overlapping with Abbott and were interested in protecting Abbott's trade secrets and confidential materials.

## ARGUMENT

### 1. TROS are not favored and, in this case, should not be granted.

A temporary restraining order ("TRO") is an equitable remedy that is issued in exceptional and emergency circumstances when necessary to preserve the status quo and when such circumstances are not present are not favored by the courts. Illusions Too Reality, LLC v. City of Harvey, No. 02 C 7272, 2003 WL 260335 at *5 (N.D. Ill. Feb. 4, 2003) (TRO is an

emergency remedy issued to maintain the status quo.). Here, the TRO is unnecessary as Mr. Clavel's new employer has agreed to postpone his start date until this matter has been resolved.

**2.  Abbott is not likely to succeed on its claims.**

As can be seen above, Mr. Clavel, did not cavalierly seek to obtain any new place of employment despite suffering an impact on his well-being from an abusive work environment by his supervisor. He took pains to obtain assurances that any place of employment that he would move to was as committed to sealing off Abbott's confidential and trade secret information from being transmitted to Bio-Rad. Thus, he checked Abbott's list, and he asked his new employer to review his restrictions and assure him there were no problems. He asked that they add to the job offer letter a commitment to be proactive even after joining them to protect Abbott's confidential information and trade secrets. And after being made aware of this lawsuit where Abbott was concerned, Mr. Clavel took the additional step, at a financial cost to him, to deferring his start date with Bio-Rad so as assure Abbott and the court that there is no intent to take anything from Abbott and transferring it to Bio-Rad. (*Id.* ¶15)

A.  The Courts Look with Disfavor on Restraints of Trade.

Restricted covenants are not favored, especially if they over broadly restrict the individual's right to employment beyond what is necessary to protect Abbott's legitimate proprietary interests. Eichmann v. National Hospital & Health Care Services Inc, 308 Ill. App. 3d 337, 345 (1st Dist. 1999) ("Courts uphold only those noncompetition agreements which protect the employer's legitimate proprietary interests and not shoe whose effect is to prevent competition per se.") Here, Abbott is restricting Mr. Clavel from employment in "each country Abbot conducts business" with any Competing Business while

3

performing "the same or similar function or purpose" to any service he provided to Abbott during his employment <u>or</u> if it would result in the use of Confidential Information. Meaning his new position would not need him to use Confidential Information in order to be prohibited. He will be working in a new division and his new employer has agreed to restrict his work from anything he did at Abbott. He restricted covenant is overbroad and should be excised. It should not be used to shore up any TRO and used to prevent him from working for Bio-Rad.

B. <u>Abbott presents no Evidence that Defendant Clavel is Taking Trade Secrets.</u>

Abbott's request for the drastic remedy of a TRO is grounded only on assumptions and mischaracterizations, and therefore its motion should not be granted.

 1. Abbott begins by trying to characterize Mr. Clavel as a liar. This is not true. As can be seen from Mr. Clavel's affidavit at no time did Mr. Clavel lie to Abbott. He had not signed the job offer when he spoke with the HR Director and told her that he had not signed an employment agreement. (*Id.* ¶8) It was not signed until later that day. (*Id.* ¶19) He did respond truthfully to other requests about whether he was still interviewing, because he was and continues to interview. (*Id.* ¶¶ 8-11)

 2. Forwarding of Abbott's documents to his personal Gmail account while an Abbott employee does not demonstrate any intent to take those documents months later to Bio-Rad. It is not uncommon for employees to have work and personal documents on their work and person email sites. Mr. Clavel did forward Abbott information, and sometimes his employees sent information to his personal Gmail account (*Id*. ¶16), but this was done to assist in his ability to perform his employment for Abbott. (*Id.*) There is no evidence

4

presented by Abbott that he did this in order to take that information, months later, after he decided to look for a new job.

3. Attaching USB devices to his computer is not deceptive. Although Abbott describes the attachment of USBs to a computer as nefarious, as is clear form Mr. Clavel's affidavit employees often attach USBs to his computer. In fact the very listing of some of the USBs attached to his computer demonstrate that this argument is mere suspicion and nothing more. Mr. Clavel recites that he did attach numerous USBs to his A computer including his Garmin sports watch, his supervisor's projector, and other employee computers. Again, Abbott does not demonstrate in any way that these were done with the intent to take A documents. It is true that Mr. Clavel attached USB storage devices to his computer. (¶18) As with any employee, when departing he needed to obtain his personal documents. It is also clear, however, that as Mr. Clavel avers, that he did his best to delete all Abbott substantive documents from his computer and personal email before his employment with Abbott ended. (*Id.*)

4. Mr. Clavel truthfully recently identified only three documents that were missed on that prior review. (*Id.* ¶21.) But, at counsel's instruction, he has not deleted them. However, those documents were not sent to his computer by Mr. Clavel or they contain outdated information. (*Id.* ¶21.) These will be deleted once there is no risk of Abbott arguing that he attempted to damage the records.

5. Clavel's written notification to Abbott of his new employer on October 28, 2020 is not evidence of deception. Although Mr. Clavel told Abbott before October 28 that he was going to Bio-Rad, he also notified them in writing that on October 28, 2020 of his new employer. Far from being evidence of deception, this demonstrates Mr. Clavel's adherence

to his contractual requirements. As A well knows, the contract it drafted required that Mr. Clavel inform Abbott in writing of his new employer. However, Abbott's contract, does not specify when that notice to is to be provided. If anything, the written notice to Abbott demonstrates that again Mr. Clavel abided by the requirements of Abbott.

6. Failure to give passwords is not evidence of deception. The complete conversation again demonstrates wanting to protect Abbott's documents. Mr. Clavel did not receive a formal request for the passwords until his exit interview, after which he immediately provided them to Abbott HR. (*Id.* ¶24.)

In short, none of the innocuous facts that Abbott has assembled here suggest that Mr. Clavel sought to or indeed gave any confidential or trade secrets to Bio-Rad. To the contrary, the record demonstrates that Mr. Clavel tried repeatedly to be sure that he did not transfer any confidential or trade secrets to Bio-Rad.

### 3. **Defendant Clavel is the Only Party to Suffer Irreparable Harm if Relief is Granted.**

Abbott's assertion that it will suffer irreparable harm collapse when viewed against the backdrop of all the facts. Facts that demonstrate that far from being a scheming deceptive employee, Mr. Clavel took pains to ensure the sanctity of Abbott's confidential information when he sought new employment. Abbott's suspicions that its many secrets will be shared is just not based on what has occurred here.

On the other hand, Abbott had already imposed harm and will continue to impose harm on Mr. Clavel. The very act of filing a TRO, public document, that Mr. Clavel sought to take from Abbott its confidential information has besmirched Mr. Clavel for all future employees and damaged his reputation. Forever, there is now a record that Mr. Clavel was viewed with

suspicion. Given that Mr. Clavel has deferred his employment with BR it is unclear if Abbott's action will also destroy his employment opportunity with Bio-Rad. Although Bio-Rad's counsel has reached out to Abbott's counsel to work out any limitations to ensure the sanctity of A's confidential and trade secrets, as it has with all other Abbott employees they have hired, Abbott has not returned that call.

We implore the court not to compound the harm done to Mr. Clavel by granted the exceptional remedy of a TRO and further creating a record to harm Mr. Clavel for the remainder of his working life.

## CONCLUSION

For the foregoing reason, Clavel respectfully request that the Court deny Abbott's motion for a temporary restraining order and any other relief requested by the Court.


       /s/Darlene Vorachek
Darlene A. Vorachek
Caroline E. Rdzanek
Terrill A. Wilkins
ABRAHAMSON VORACHEK & RDZANEK
120 N. LaSalle Street, Suite 1050
Chicago, IL 60602
(312) 263-2698

Dated:   November 2, 2020